## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MICHAEL H. PIROTTE, individually and as Special Administrator of the ESTATE OF ROSAIRE B. PIROTTE<br><br>        Plaintiff,<br><br>v.<br><br>HCP PRAIRIE VILLAGE KS OPCO LLC D/B/A BRIGHTON GARDENS OF PRAIRIE VILLAGE, HEALTHPEAK PROPERTIES, INC., HCP S-H SUNRISE OPCO HOLDCO, LLC, HCP MA 4 KANSAS CITY, KS LP, SUNRISE SENIOR LIVING MANAGEMENT, INC., WELLTOWER OPCO GROUP, LLC, WELLTOWER, INC., HCP S-H OPCO TRS LLC, HCP SENIOR HOUSING PROPERTIES, LLC, AND LISA BARNES,<br><br>        Defendants. | Civil Action File No |

**NOTICE OF REMOVAL BY DEFENDANTS HCP PRAIRIE VILLAGE KS OPCO LLC, SUNRISE SENIOR LIVING MANAGEMENT, INC., LISA BARNES, HEALTHPEAK PROPERTIES, INC., HCP S-H SUNRISE OPCO HOLDCO, LLC, HCP MA 4 KANSAS CITY, KS LP, WELLTOWER OPCO GROUP, LLC, WELLTOWER, INC., HCP S-H OPCO TRS LLC, AND HCP SENIOR HOUSING PROPERTIES, LLC**

COME NOW, Defendants HCP PRAIRIE VILLAGE KS OPCO LLC, SUNRISE SENIOR LIVING MANAGEMENT, INC., LISA BARNES, HEALTHPEAK PROPERTIES, INC., HCP S-H SUNRISE OPCO HOLDCO, LLC, HCP MA 4 KANSAS CITY, KS LP, WELLTOWER OPCO GROUP, LLC, WELLTOWER, INC., HCP S-H OPCO TRS LLC, and HCP SENIOR HOUSING PROPERTIES, LLC, , by and through their undersigned counsel, and hereby remove this action from the District Court of Johnson County, Kansas, to the United States District Court

for the District of Kansas, pursuant to 28 U.S.C. §§ 1441, 1446, and 1442, while reserving all defenses and reserving all objections to venue based on 42 U.S.C. § 247d-6d(e)(1).

## I.    PROCEDURAL REQUIREMENTS

1.      This action was filed in the District Court of Johnson County, Kansas, as Civil Action No. 21CV01598 on April 14, 2020.  *See* **Exhibit A**, Summons and Complaint.

2.      Defendants HCP Prairie Village OpCo, LLC, Sunrise Senior Living Management, Inc., Lisa Barnes, Welltower OpCo Group, LLC, and Welltower, Inc. were served with the Summons and Complaint on July 6, 2021.   Defendants HCP Senior Housing Properties, LLC, Healthpeak Properties, Inc., HCP S-H OpCo TRS, LLC, and HCP MA4 Kansas City KS, LP were served on July 7, 2021.  Defendant HCP S-H Sunrise OpCo Holdco, LLP was served on July 8, 2021[1]  Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C § 1446(b)(1).

3.      Two grounds for removal exist in this case: (1) federal question jurisdiction based on complete preemption of state law claims under the Public Readiness and Emergency Preparedness Act, 42 U.S.C. §§ 247d-6d, 247d-6e (the "PREP Act") and (2) federal question jurisdiction because the claims contain a substantial, embedded question of federal law under the doctrine recognized by the United States Supreme Court in *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g.,* 545 U.S. 308 (2005).

4.      Removal to the United States District Court for the District of Kansas, Kansas City-Leavenworth Division, is proper because the Complaint was filed in the District Court of Johnson County, Kansas, which is located within the jurisdiction of this District.  *See* 28 U.S.C. § 1441(a); 28 U.S.C. § 96.

---

[1]     Defendants expressly reserve and do not waive objections to proper service of Summons and the Complaint.

5.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiff, and a copy is being filed with the Clerk of the District Court of Johnson County, Kansas.

## II.      FACTUAL ALLEGATIONS RAISED IN THE COMPLAINT[2]

6.      The Complaint asserts claims against Defendants in the context of Defendants' provision of care to Ms. Rosaire B. Pirotte during the worldwide COVID-19 pandemic.  *See generally* Pet. While Plaintiff purports to bring these claims under color of state law – specifically, wrongful death, negligence, and survival action and lost chance of recovery –the claims actually arise from and relate to Defendants' use or administration of covered countermeasures designed to combat and prevent the spread of COVID-19 pursuant to the PREP Act.

7.      Plaintiff alleges that Ms. Pirotte was admitted to Brighton Gardens, a senior living community, "on or about June 2016" [sic].  (Pet. ¶¶ 44).

8.      As well known by now, this nation was besieged in March 2020 by the global pandemic known as COVID-19 which, at the time, had no known cure, therapeutic treatment, or vaccine.  By January 31, 2020, the Secretary of Health and Human Services ("HHS"), declared a public health emergency because of COVID-19,[3] and on March 11, 2020, the World Health Organization ("WHO") declared a global pandemic.[4]  By March 12, 2020, Kansas Governor Laura Kelly declared a state of emergency,[5] and on March 13, 2020, the President of the United States

---

[2]    Defendants accept as true the allegations in the Petition only for purposes of this Notice of Removal.

[3]    Determination that a Public Health Emergency Exists (Jan. 31, 2020), available at: https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.

[4]    WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail          /who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[5]    State of Disaster Emergency Proclamation (Mar. 12, 2020), https://governor.kansas.gov/wp-content/uploads/2020/03/2020-03-12-Proclamation.pdf.

declared a nationwide emergency pursuant to the Stafford Act.[6]

9.      On April 22, 2020, Governor Kelly issued Executive Order 20-26 ("EO 20-26"), in part due to the significant challenges health care providers would face in staffing and capacity as a result of COVID-19.[7]  Governor Kelly reaffirmed the important role of facilities like Brighton Gardens in "making clinical and triage decisions and rendering assistance, testing, care, or advice in the care of patients reasonably suspected or confirmed to be infected with COVID-19."[8]

10.     At that point in the pandemic, not only was there no cure or vaccine[9] for COVID-19, there was also little understanding of how COVID-19 was spread.[10]  There were also documented shortages of personal protective equipment ("PPE") that could limit the spread of COVID-19.[11]  Guidance from public health authorities on how best to prevent and mitigate the spread of COVID-19 was constantly changing and sometimes contradictory,[12] including in the use and administration of PPE and other covered countermeasures.

---

[6]  Letter on Emergency Determination Under the Stafford Act (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/briefings-statements/letter-president-donald-j-trump-emergency-determination-stafford-act/.

[7]  Kansas Executive Order 20-26 (Apr. 22, 2020), *available at* https://governor.kansas.gov/wpcontent/uploads/2020/04/EO-20-26-Executed.pdf.

[8]  *Id.*

[9]  *Coronavirus disease (COVID-19) advice for the public: Mythbusters*, WHO (Mar. 26, 2021) ("There is currently no licensed medication to cure COVID-19."), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/myth-busters.

[10]  *See Best Remedy for Covid-19 is Prevention*, Centers for Disease Control and Prevention ("CDC") (Mar. 16, 2020) ("There isn't currently a vaccine or cure for coronavirus"), https://blogs.cdc.gov/cancer/2020/03/16/best-remedy-for-covid-19-is-prevention/.

[11]  On May 11, 2020, the U.S. Army reported the Kansas National Guard was helping health officials address PPE shortage through decontamination so they can be used again. "Kansas National Guard helps extend the life of N95 masks," U.S. ARMY (May 11, 2020), https://www.army.mil/article/235507/kansas_national_guard_helps_extend_the_life_of_n95_masks. In September 2020, the State of Kansas continued attempts to remedy insufficient PPE for private businesses.  *See also* "Governor Laura Kelly Announces Personal Protective Equipment Program for Kansas Businesses," Kansas Office of the Governor (Sept. 9, 2020), https://governor.kansas.gov/governor-laura-kelly-announces-personal-protective-equipment-program-for-kansas-businesses.

[12]  Erin Schumaker, *CDC and WHO offer conflicting advice on masks. An expert tells us why,* ABC News (May 29, 2020) (contrasting CDC's guidance to wear a face mask in public to help slow the spread of COVID-19 with WHO guidelines that one need only wear a mask if taking care of a person with COVID-19), https://abcnews.go.com/Health/cdc-offer-conflicting-advice-masks-expert-tells-us/story?id=70958380

Despite aggressive efforts by the government and health care community, there have been more than 188 million confirmed cases of COVID-19 globally.  In the United States, nearly 34 million people have contracted the virus; more than 600,000 of those individuals have passed away as a result.  In Kansas, more than 323,000 people have contracted the virus, and over 5,520 have passed away from the disease.  These numbers have disproportionately impacted older Americans; approximately 80% of persons who have died from COVID-19 are age 65 or older.[13]

11.     In response to the pandemic, the Secretary of HHS issued a Declaration activating the "PREP Act," which provides sweeping immunity protections to protect its COVID-19 partners, such as Defendants, from liability and suit as they use or administer covered countermeasures "to treat, diagnose, cure, prevent, or mitigate COVID-19."[14]  Since its initial publication, the Secretary has amended the Declaration seven times[15], and issued six Advisory Opinions which, collectively, clarify the scope of immunity.

12.     On March 24, 2020, to address challenges in maintaining health care staffing during the pandemic, the Secretary issued a letter to all 50 states stating: "For healthcare professionals to feel comfortable serving in expanded capacities on the frontlines of the COVID-19 emergency, it is imperative that they feel shielded from medical tort liability."[16]  The Secretary cautioned, "I do not want state variations in liability protections to confuse or deter health professionals in this COVID-19 emergency."[17]

---

[14]   *See* 85 Fed. Reg. 15198, 15202 (Mar. 17, 2020).

[15]   *See* 85 Fed. Reg. 21012 (Apr. 15, 2020), 85 Fed. Reg. 35100 (June 8, 2020), 85 Fed. Reg. 52136 (Aug. 24, 2020), 85 Fed. Reg. 79190 (Dec. 9, 2020), 85 Fed. Reg. 7872 (Feb. 2, 2021, *corrected* Feb. 22, 2021), 86 Fed. Reg. 9516 (Feb. 16, 2021, *corrected* Feb. 21, 2021), and 86 Fed. Reg. 14462 (Mar. 16, 2021).

[16]   Secretary of HHS, Alex Azar II, Letter to Governors (March 24, 2020), https://www.nacds.org/pdfs/government/2020/SecAzar-COVID-Governor-Letter-3-24-20.pdf.

[17]   *Id.*

13.     On July 19, 2021, the Secretary issued a Renewal of Determination That A Public Health Emergency Exists, extending the Determination by former Secretary Alex M. Azar II "that a public health emergency exists and has existed since January 27, 2020, nationwide."[18]

14.     Consistent with the Declaration, Defendants administered an enhanced infection control program to prevent and mitigate the spread of COVID-19 at the Facility.  According to the Petition, for example, Ms. Pirotte and residents were to be quarantined to their rooms, and visitors were restricted.  (Pet. ¶¶ 51, 54).

15.     Also, Brighton Gardens conducted diagnostic testing for COVID-19 for both staff and residents during mid-April 2020 through April 24, 2020.  (Pet. ¶ 50).

16.     Brighton Gardens also used or administered personal protective equipment ("PPE") to combat the spread of COVID-19, although Plaintiff alleges staff were not properly trained or monitored on such use of PPE.  (Pet. ¶¶ 61, 67(d)).

17.     In the Petition, Plaintiff repeatedly references and relies on Brighton Gardens' "standing orders," "instructions," "guidelines," "infection control protocols," and "plan of improvement" regarding the prevention of COVID-19 (collectively, "COVID-19 Protocols") in support of the claims, but does not attach them.  Plaintiff claims that such COVID-19 Protocols were not effectively or timely implemented.  (Pet. ¶¶ 65, 67(b), 67(l)).  Two representative documents of such protocols are attached hereto as **Exhibits B-C** and may be considered as part of this Notice of Removal.  *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (factual allegations include not only the statements in the complaint but also the documents referenced in the complaint that are central to the claims); *Ave. Capital Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 881 (10th Cir. 2016) (explaining that documents referenced in

---

[18]  Secretary of HHS Xavier Becerra, "Renewal of Determination That A Public Health Emergency Exists" (July 19, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-19July2021.aspx.

complaint that are central to a plaintiff's claims can be considered under Rule 12(b)(6)); *Frederick v. Hartford Underwriters Insurance Company*, 683 F.3d 1242, 1247 (10th Cir. 2012) (reversing district court remand of case because "it did not consider the defendant's notice of removal or the evidence submitted supporting jurisdiction"); *Neighbors v. Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (explaining that courts may consider documents referenced in a complaint at the motion to dismiss stage).[19]

18. Specifically, these COVID-19 Protocols were implemented beginning March 2020, and were continually updated and revised to conform with changing, evolving, and sometimes conflicting guidance from public health authorities.  These COVID-19 Protocols outline efforts Defendants took to combat, prevent, diagnose, and treat COVID-19, including the use or administration of covered countermeasures.  Among other things, these COVID-19 Protocols:

- required resident screening "twice daily for fever and/or other symptoms" and "***temperature*** and symptom monitoring (**Exhibit B**);

- required training in "proper hand hygiene" including "correct donning and doffing of ***Personal Protective Equipment (PPE)***" (**Exhibit B**);

- required staff to "perform hand hygiene by ***using alcohol based hand rubs***" or wash hands with soap and water and "[p]ut on a ***regular facemask*** or an ***N95 respirator mask*** (if available) before entry into the resident room" (**Exhibit B**);

- called for "***pulse oximetry*** monitoring" in consultation with physician's orders (**Exhibits B, C**);

---

[19]   In determining whether subject matter jurisdiction exists in a case, there are two approaches: a review based upon the face of the complaint, and factual review.  In determining factually whether subject matter jurisdiction exists, this Court may weigh the evidence in determining its power to hear the case. *See Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).

- called for "*[t]emperature [c]hecks*" of staff for fever at the beginning of every shift and screening for staff to be asked if they are experiencing cough, shortness of breath, GI distress, nasal congestion, runny nose, or sore throat (**Exhibits B, C**);

- addressed use of "*gowns*" for direct care activities, including "put[ting] on a clean isolation gown upon entry into the patient room or area" (**Exhibit B**);

- addressed "*eye protection (i.e., goggles or disposable face shield that covers the front and sides of face)*" as standard PPE required for contact with suspected or known cases of COVID-19 (**Exhibit B**);

- required any essential visitor to be "*screen[ed] for fever*", to wash their hands utilizing "*alcohol based hand sanitizer*", and to wear a "*facemask*" (**Exhibit C**);

- "[r]equired *PPE* for direct care of a resident with known or suspected COVID-19" including "*[i]solation gown*," "*facemask* or *N95 respirator*"; "*eye goggles* or *face shield*", and "non-sterile *gloves*" (**Exhibit B**);

- directed how staff should "[d]on (put on) all *PPE*" (**Exhibit B**); and

- provided staff with guidance for "*PPE Preservation Strategies*" including guidance for *gloves*, *gowns*, *goggles/face shields*, and *masks*, including "*regular facemask[s]*" and "*N95 respirator mask[s]*." (**Exhibit B**).[20]

19.    Plaintiff also expressly references and relies on Defendants' alleged "assess[ments]" and "document[ation] of Ms. Pirotte's physical condition," (Pet. ¶¶ 67(p), 67(q)) as a basis for the claims.  These documents, excerpts of which are attached as **Exhibit D**, reveal that Defendants used *thermometers*, a covered countermeasure under the PREP Act, to conduct frequent temperature checks (at least daily) starting on March 13, 2020 and utilized the Center for

---

[20]  Emphases have been added in the quotations in the above bullets to signify covered countermeasures.

Disease Control ("CDC") definitions of fever.  *See, e.g.*, **Exhibit D** at pp. 1-2.  Such records also reveal at least two instances in which Ms. Pirotte was tested for COVID-19.  *See* **Exhibit D** at pp. 3-4 ("resident tested negative for covid and will be retested on Tuesday"); ("resident was retested for covid-19 today").[21]  These records indicate that Defendants administered ***medications*** in the form of doxycycline hyclate tablets starting on or about May 14, 2020, when Ms. Pirotte was exhibiting covid symptoms including cough, *see* **Exhibit D** at pp. 3-4 ("Give 1 tablet by mouth two times a day for infection/BLE cellulitis/PPX/ . . . ."), and morphine sulfate.  *See* **Exhibit D** at p. 5.  Such records also reveal administering "***[o]xygen***," "***Mucinex***", and "***breathing treatments***".  *See* **Exhibit D** at p. 6.

20.     Despite Defendants' preventative measures, the Petition alleges that Ms. Pirotte was diagnosed as COVID-19 positive on May 15, 2020. (Pet. ¶ 57).  She died on May 19, 2020, at age 90, allegedly from COVID-19.  (Pet. ¶¶ 58, 83).

21.     The Petition also alleges proximate cause between the above alleged acts and omissions and the claimed loss, across all counts of the Complaint:

- "As ***a direct and proximate result*** of the Defendants' negligence as stated above," Ms. Pirotte "suffered severe pain, anxiety, mental distress, and ultimately death" (Pet. ¶ 72);

- "As a ***direct and proximate result*** of the Defendants' negligence," Ms. Pirotte "was allowed to be exposed to and contract COVID-19, causing her to experience pain, suffering, and ultimately death" (Pet. ¶ 83).

---

[21] The documentation also notes that Ms. Pirotte was isolated when she began exhibiting symptoms consistent with COVID-19.  **Exhibit D** at p. 4.

### III.   FEDERAL QUESTION JURISDICTION EXISTS UNDER 28 U.S.C. § 1441(a) AND 42 U.S.C. § 247d-6d

22.     This case is removable under 28 U.S.C. § 1441(a) on the basis of "original jurisdiction" because Plaintiff's Complaint asserts a claim "arising under" federal law within the meaning of 28 U.S.C. § 1331.

23.     A defendant may remove a claim "[w]hen a federal statute wholly displaces the state-law cause of action through complete preemption." *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003). "When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." *Id.* at 8.

24.     In this Court there is a simple two-part test to determine whether a claim is completely preempted: (1) whether the federal law at issue preempts the state law plaintiff relies on; and (2) whether Congress intended to allow removal in such cases, as manifested by the creation of a federal cause of action to enforce the regulation. *See Keller v. Bank of America, N.A.*, 228 F. Supp.3d 1247 (D. Kan. 2017) (denying remand and finding the federal Fair Credit Reporting Act completely preempted state law claims) (citing *Devon Energy Prod. Co. v. Mosaic Potash Carlsbad, Inc.,* 693 F.3d 1195, 1204 (10th Cir. 2012)). More specifically, "[f]or complete preemption to apply, the federal remedy must provide some vindication for the same basic right or interest alleged by the plaintiff." *Devon*, 693 F.3d at 1207.

25.     These same hallmarks of complete preemption are present in the PREP Act. First, the plain language of the PREP Act evinces Congress's intent that the PREP Act completely preempt and displace all state law claims relating to the use or administration of countermeasures during a public health emergency declared by HHS. The PREP Act extends immunity from suit

and liability to covered persons for all claims for loss, whether based in federal or state law.  *See* 42 U.S.C. § 247d-6d(a)(1).  In addition, in a subsection conspicuously titled, "PREEMPTION OF STATE LAW," the PREP Act provides that no state "may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that [] is different from, or is in conflict with, any requirement applicable under this section."  42 U.S.C. § 247d- 6d(b)(8)(A).

26.     Second, the PREP Act provides administrative remedies to all claimants, *see* 42 U.S.C. § 247d-6e(a), as well as an exclusive federal cause of action with special procedures and remedies governing that cause of action.  See 42 U.S.C. § 247d-6d(d).  This federal cause of action is an exception to PREP Act immunity and applies to injuries caused by alleged willful misconduct. In such cases, a plaintiff must file suit in the D.D.C., see 42 U.S.C. § 247d-6d(e)(1), and only after exhausting the administrative remedies available under the PREP Act, see 42 U.S.C. § 247d-6e(d). Specifically, aggrieved individuals must apply for compensation from the Fund, which was created to provide "timely, uniform, and adequate compensation to eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure."  42 U.S.C. § 247d–6e(a).

27.     Importantly, any individual who suffers an injury caused by the use or administration of covered countermeasure, not just those injured by willful misconduct, may apply to the Fund for compensation.   Thus, the PREP Act offers a remedy for all individuals claiming loss by the use or administration of a covered countermeasure.

28.     As the Supreme Court has explained, these types of procedural and remedial structures applicable to preempted claims "undeniably bespeak an intent to displace state-law remedies entirely."  *See Beneficial Nat. Bank*, 539 U.S. at 8.

29.     Advisory Opinion 21-01 ("AO 21-01") confirms the PREP Act is a complete preemption statute that can be invoked by allegations of failure to act or inaction.[22]  AO 21-01 explains that PREP Act immunity applies to situations including but not limited to a conscious decision by a program planner not to use a covered countermeasure, and clarifies that "decision-making that leads to the non-use of covered countermeasures by certain individuals is the grist of program planning, and is expressly covered under the PREP Act."[23]

30.     On February 2, 2021, following the change in Administration, the Fifth Amendment reaffirmed that the PREP Act is a complete preemption statute, and explains that "[t]he plain language of the PREP Act makes clear that there is complete preemption of state law as described above.  Further, preemption of State law is justified to respond to the nation-wide public health emergency caused by COVID-19. . . ."  85 Fed. Reg. 7874.

31.     In addition to these HHS authorities, the U.S. Department of Justice ("DOJ") filed a Statement of Interest ("SOI") of the *United States in Bolton v. Gallatin Center for Rehabilitation & Healing, LLC*, No. 3:30-cv-00683 (M.D. Tenn.), which constitutes the official position of the United States' interest in the enforcement of the PREP Act providing, *inter alia*, that the principle of PREP Act immunity for all Federal and state law claims, coupled with a sole exception process, makes the PREP Act a complete preemption statute.  *See id.*, Dkt. No. 35 (Jan. 19, 2021), at 7–8.[24]

32.     The United States Court for the Central District of California considered a case with very similar factual allegations, finding that even where the PREP Act was not mentioned at all,

---

[22] *See* AO 21-01 available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2101081078-jo-advisory-opinion-prep-act-complete-preemption-01-08-2021-final-hhs-web.pdf.

[23] *Id.*

[24] The DOJ's SOI commenting on the scope of a federal court's jurisdiction is of "considerable interest" to the courts.  *See Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004); *Garb v. Republic of Poland*, 440 F.3d 579, 584 (2d Cir. 2006).

"[t]he acts and omissions alleged by Plaintiffs appear almost verbatim in the January 8, 2021 Advisory Opinion" and that the PREP Act applied to the plaintiffs' claims. *See Garcia v. Welltower OpCo Group LLC*, No. 8:20-cv-02250-JVS-KESx, at 14 (C.D. Cal. Feb. 10, 2021). That court also concluded that "because the OGC stated that the PREP Act is a complete preemption statute . . . an adequate basis for federal question jurisdiction exists." *Id.* at 14-15.

33.     Another federal district court similarly held that the PREP Act was a complete preemption statute in *Rachal v. Natchitoches Nursing and Rehabilitation Center LLC,* 21-cv-00334-DCJ-JPM (W.D. La. Apr. 30, 2021), Dkt. 13. The *Rachal* court emphasized that the PREP Act "provisions demonstrate Congress's intent that the PREP Act exclusively encompass 'claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure.'" *Id.* at 4 n.3.  Thus, to the extent the plaintiff's complaint alleged injury caused by a covered person and arose out of, related to, or was caused by the use or administration of a covered countermeasure, "this Court has federal question jurisdiction to apply the provisions of the PREP Act." *Id.*

34.     In other words, during the designated period of time of the Secretary's Declaration, a claimant may not pursue ordinary state law claims under statutory or common law to achieve a different result or more monetary damages than provided by the PREP Act.  Here, because the PREP Act is invoked by virtue of the alleged acts and omissions of Defendants, as covered persons who engaged in the use or administration, or even non-use or non-administration of covered countermeasures, complete preemption applies.

A.  **The PREP Act Applies to Plaintiff's Claims.**

35.     It is also clear that the allegations and claims pled by Plaintiff invoke the PREP Act.  The PREP Act completely preempts state law claims and affords immunity protection from

liability and suit to "covered persons" who engaged in "recommended activities" by using or administering "covered countermeasures" during times of national emergency, such as COVID-19.

36.     Defendants in this action are covered persons because they meet the requirements of a "program planner" and are "qualified persons who prescribed, administered or dispensed" countermeasures under the PREP Act.   Specifically, Defendants were acting as "program planners" that supervised an infection control program, under which FDA-approved PPE, such as masks and gloves, as well as diagnostic testing and other countermeasures, were distributed and administered to Plaintiff, staff, and other residents in an effort to diagnose, mitigate, and prevent COVID-19.   Further, Defendants' employees and affiliates were acting as employees of a "program planner" that supervised and administered the infection control program that provided and administered FDA-approved countermeasures on Ms. Pirotte and the staff of the Facility in an effort to diagnose and mitigate COVID-19.  *See* 42 U.S.C. § 247d-6d(i)(2); AO 20-04, as modified, at 5-7.

37.     Defendants also used or administered "covered countermeasures," which apply to a large number of products, including any devices approved by the FDA,[25] any products subject to Emergency Use Authorizations ("EUAs")[26], as well as PPE,[27] COVID-19 diagnostic test kits,[28] and others.  42 U.S.C. § 247d-6d(i)(1); 85 Fed. Reg. 15198-15203 (Mar. 17, 2020).

---

[25]   *See generally*, 21 C.F.R. Ch 1, Subchapter H (with respect to devices).

[26]   *See Emergency Use Authorization*, U.S. Food & Drug Admin., https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#covidppe.

[27]   *See, e.g.,* 21 C.F.R. §§ 878.4040 (2018) (surgical apparel), 880.6250 (2019) (non-powdered patient examination gloves), 880.6265 (2008) (examination gowns). The EUAs are available at https://fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical0devices/personal-protective-equipment-euas.

[28]   *See* EUAs *supra* note 7.

38.     While the number of products meeting the definition of "covered countermeasures" are "too numerous to list," they certainly includes the multiple covered countermeasures identified in the Petition, such as: (1) diagnostic products like as COVID-19 tests; (1) products used to reduce the spread of COVID-19, such as PPE, like gowns, masks, and gloves, as well as N-95 respirators, and hand sanitizers; (3) products used to monitor individuals with confirmed or suspected COVID-19, such as thermometers and pulse oximeters; and (4) drugs, devices, and therapeutics administered to individuals with confirmed or suspected COVID-19, such as supplemental oxygen.[29]

39.     Because Defendants acted in their statutory role as program planners to make reasonable choices in allocating covered countermeasures and prioritize the administration or use of covered countermeasures like diagnostic testing, the alleged actions and omissions as described above are examples of covered countermeasures under the PREP Act.

40.     Defendants' employees and affiliates in this action also were acting as "qualified persons" under 42 U.S.C. § 247d-6d, as senior living communities such as Brighton Gardens are authorized to administer, deliver, and use FDA covered countermeasures, like personal protective equipment and FDA approved COVID-19 devices and diagnostic tests, pursuant to Kansas licensure laws for registered nurses, respiratory therapists, and licensed practical nurses, as well as Kansas Executive Order 20-26 and K.S.A. § 48-924 to diagnose and prevent COVID-19.

---

[29] *See* Advisory Opinion 20-01; 21 CFR §§ 878.4040 (surgical apparel), 880.6250 (non-powdered patient examination gloves), 880.6256 (examination gowns); 21 CFR §§ 880.2200, 880.2900, 880.2910, 880.2920, 880.2930 (thermometers); 21 C.F.R. § 870.2700 (Pulse oximeters); 21 C.F.R. §§ 870.4100, 868.5340, 868.5570 (non-rebreather masks and nasal cannulas for administration of supplemental oxygen); 82 Fed. Reg. 60474 (final rule for health care antiseptic products); 84 Fed. Reg. 14847 (final rule for consumer antiseptic products); FDA Combating COVID-19 with Medical Devices, FDA, available at: https://www.fda.gov/media/136702/download (listing Emergency Use Authorization for *inter alia*, COVID-19 test kits, certain types of PPE, respiratory protective devices, therapeutics, and drugs).

41.     Defendants were engaged in the management and operation of countermeasure programs in an effort to diagnose and prevent COVID-19, or the transmission of SARS-coV-2 or a virus mutating therefrom to a "population" and within a "geographic area" specified by the Declaration Under the PREP Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198-15203 (Mar. 17, 2020) and all amendments thereto — or reasonably believed so by Defendants.

42.     The infection control program administered by Defendants also constituted engagement in "recommended activities" for "covered countermeasures" during the COVID-19 global pandemic and national health emergency, as such terms are defined in the PREP Act.

**B.  PREP Act Immunity Also Extends To Alleged Failure To Act Or Inaction.**

43.     Both the PREP Act and HHS authorities make clear that an alleged failure to act, or inaction, may still fall within the scope of PREP Act immunity.  The PREP Act contemplates both "acts and omissions," the latter of which means failure to act.  *See, e.g.*, 42 U.S.C. § 247d-6d(c)(1)(A), (c)(2)(A), (c)(4), (e)(3).  The Fourth Amendment, for example, confirms that a covered person's "administration" of covered countermeasures extends beyond just physical provision of tangible countermeasures, as there can be situations where not administering a covered countermeasure falls within the PREP Act and the Declaration's immunity provisions.  85 Fed. Reg. 79194.

44.     AO 21-01 likewise rejects the notion that immunity under the PREP Act requires actual "use" of a covered countermeasure, provides that "this 'black and white' view clashes with the plain language of the PREP Act, which extends immunity to anything *'relating to'* the administration of a covered countermeasure."  *See* AO 21-01 (citations omitted) (emphasis added).

45.     AO 21-01 further provides, "There can potentially be other situations where a **conscious decision not to use a covered countermeasure** could relate to the administration of the countermeasure. . . . . *[D]ecision-making that leads to the non-use of covered countermeasures by certain individuals is the grist of program planning, and is expressly covered by PREP Act*." *Id*. at 4 (emphasis added).  Because Plaintiff's allegations concern Defendants' alleged decisions to use or administer covered countermeasures, or not use or administer them for legitimate reasons, the claims squarely fall within the PREP Act.[30]

46.     As confirmed in AO 21-01, when the PREP Act is triggered, complete preemption attaches.  Indeed, "[t]he *sine qua non* of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court.  The PREP Act does both."  *See* AO 21-01.[31]

### IV.     FEDERAL QUESTION JURISDICTION ALSO EXISTS UNDER THE *GRABLE* DOCTRINE

47.     In addition to complete preemption, the PREP Act confers separate, independent grounds for federal question jurisdiction under the *Grable* doctrine.

---

[30]   While Plaintiff alleges "failure" several times throughout the Petition, Plaintiff either qualifies that Defendants did not timely or effectively implement a protocol (i.e., not abject failure), or alleges failure without any supporting facts stating or explaining what/which guideline applied, and how specifically Defendants violated it. "[W]here [a] Complaint's allegations are legal conclusions or contradict information contained in the documents attached to it, no [ ] presumption of truth attaches" to the allegations.  *Moreno v. Kansas City Steak Co.*, LLC, No. 17-CV-02029-DDC-KGS, 2017 WL 2985748, at *5 (D. Kan. July 13, 2017) (citing GFF *Corp.*, 130 F.3d at 1385 (explaining that the court need not accept "legal conclusions and factual allegations that contradict . . . a properly considered document" as true)).

[31]   The Fourth Amendment expressly incorporated HHS Advisory Opinions into the Declaration itself. 85 Fed. Reg. 79195.  While AO 21-01 postdated the Fourth Amendment, the subsequent Fifth, Sixth, and Seventh Amendments restate the same point: "[T]he former Secretary amended the declaration to incorporate Advisory Opinions of the General Counsel interpreting the PREP Act and the Secretary's Declaration. . . ." 86 Fed. Reg. 7872; 86 Fed. Reg. 9517, 86 Fed. Reg. 14463.  As such, AO 21-01 also has been incorporated into the Declaration, and should be afforded *Chevron* deference.

17

48.     On December 9, 2020 HHS amended the Declaration to make clear that the PREP

Act triggered the "substantial federal question" doctrine under *Grable*. 85 Fed. Reg. 79190 (Dec.

9, 2020). In the Preamble to that amendment, the Secretary explains:

> The Secretary makes explicit in Section XI that there are substantial federal
> legal and policy issues, and substantial federal legal and policy interests
> within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g.
> & Mf'g.*, 545 U.S. 308 (2005), in having a unified, whole-of-nation response
> to the COVID-19 pandemic among federal, state, local, and private-sector
> entities . . . .

85 Fed. Reg. at 79194.

49.     Then, in Section XI, the Secretary formally declared:

> COVID-19 is a global challenge that requires a whole-of-nation response.
> There are substantial federal legal and policy issues, and substantial federal
> legal and policy interests within the meaning of *Grable & Sons Metal
> Products, Inc. v. Darue Eng'g. & Mf'g.*, 545 U.S. 308 (2005), in having a
> unified, whole-of-nation response to the COVID-19 pandemic among
> federal, state, local, and private-sector entities. The world is facing an
> unprecedented pandemic. To effectively respond, there must be a more
> consistent pathway for Covered Persons to manufacture, distribute,
> administer or use Covered Countermeasures across the nation and the
> world.

85 Fed. Reg. at 79197-98 (emphasis supplied), *citing* 42 U.S.C. § 247d-6d(b)(7).

50.     AO 21-01 confirms that "ordaining the metes and bounds of PREP Act protection

in the context of a national health emergency necessarily means that the case belongs in federal

court."  AO 21-01 at 5.  AO 21-01 highlights the Secretary's conclusion in the Declaration that

"there are substantial federal legal and policy issues, and substantial federal legal and policy

interests within the meaning of [the *Grable* doctrine] in having a unified, whole-of-nation response

to the COVID-19 pandemic among federal, state, local, and private-sector entities." AO 21-01 at

5 (quoting 85 Fed. Reg. at 79, 197).

51.     The Advisory Opinion's interpretation of *Grable* is consistent with the Supreme

Court's long-standing rule "that in certain cases federal question jurisdiction will lie over state-

law claims that implicate federal issues." *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 312 (2005). "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.*

52.     The *Grable* Court determined that no single, precise test exists for determining whether an embedded federal issue exists, but that, in general, a two-step process exists for determining whether a state law claim "arises under" federal law: (1) the state law claim must necessarily raise a stated federal issue that is actually disputed and substantial; and (2) federal courts must be able to entertain the state law claims "without disturbing a congressionally approved balance of state and federal judicial responsibilities." *Id.* at 314. Here, both prongs are satisfied.

53.     First, Plaintiff brings claims as a result of Defendants' alleged use or administration (or nonuse or non-administration) of covered countermeasures in connection with the care and treatment of Ms. Pirotte, which necessarily implicates disputed and substantial federal issues. *See* 42 U.S.C. § 247d-6d.

54.     Second, as confirmed by the Advisory Opinions and the Declaration, the PREP Act expresses a clear intention to supersede and preempt state control of the very issues raised by Plaintiff, *i.e.,* issues concerning Defendants' conscious decisions when to use or administer (or not) covered countermeasures, including COVID-19 diagnostic testing and PPE. A substantial and disputed federal issue regarding the application of the PREP Act to Plaintiff's claims therefore necessarily exists, and must be resolved by this Court to ensure the uniform and appropriate application of the PREP Act.

55.     At the very least, Section XI should be afforded *Chevron* controlling weight because it is an agency's interpretation of the very statute it is charged with administering. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984).

56.     The *Grable* doctrine and PREP Act are therefore directly applicable to Plaintiff's claims and support this Court's jurisdiction.

## VI.     CONCLUSION

Federal jurisdiction exists in this case because (1) there is complete preemption of state law claims under the Public Readiness and Emergency Preparedness Act, 42 U.S.C. §§ 247d-6d, 247d-6e (the "PREP Act") and (2) the claims contain a substantial, embedded question of federal law under the doctrine recognized by the United States Supreme Court in *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g.*, 545 U.S. 308 (2005).  Removal to this Court is therefore proper under 28 U.S.C. § 1441.

**WHEREFORE**, having shown that this case is properly removable, Defendants provide notice pursuant to 28 U.S.C. § 1446 that the Action pending in the District Court of Johnson County, Kansas, Civil Action No. 21CV01594, is removed to the United States District Court for the District of Kansas, Kansas City-Leavenworth Division, and respectfully requests that this Court exercise jurisdiction over this case.

Respectfully submitted this 5th day of August, 2021.

**SIMPSON, LOGBACK, LYNCH, NORRIS, P.A.**

*/s/ Lawrence J. Logback*
Lawrence J. Logback, KS, #16608
Megan L. Moseley, KS #23719
Jaime L. Whitt, KS #26986
7400 W 110th Street, Suite 600
Telephone:     (913) 342-2500
Facsimile:     (913) 342-0603
llogback@slln.com

mmoseley@slln.com
jwhitt@slln.com

John E. Hall, Jr., GA #319090
Laura H. Cartner, GA #597835
*Pro Hac Vice to be filed*
HALL BOOTH SMITH, P.C.
191 Peachtree Street, N.E., Suite 2900
Atlanta, Georgia 30303
Telephone:      (404) 954-5000
Facsimile:      (404) 954-5020
jhall@hallboothsmith.com
lcartner@hallboothsmith.com

and

Charlie C.H. Lee, VA #13041
Kristen A. Bennett, VA #39276
*Pro Hac Vice to be filed*
Moore & Lee, LLP
1751 Pinnacle Drive, Suite 1100
McClean, Virginia 22102
Telephone:      (703) 506-2050
Facsimile:      (703) 506-2051
c.lee@mooreandlee.com
k.bennett@mooreandlee.com

and

Amy Miller
*Pro Hac Vice to be filed*
BUCHANAN INGERSOLL & ROONEY PC
1700 K Street, N.W. Ste. 300
Washington, D.C. 10006
Telephone:      (202) 452-7935
amy.miller@bipc.com


ATTORNEYS FOR DEFENDANTS
HCP PRAIRIE VILLAGE KS OPCO LLC,
SUNRISE SENIOR LIVING MANAGEMENT, INC.,
LISA BARNES, HEALTHPEAK PROPERTIES, INC.,
HCP S-H SUNRISE OPCO HOLDCO, LLC, HCP MA 4
KANSAS CITY, KS LP, WELLTOWER OPCO GROUP,
LLC, WELLTOWER, INC., HCP S-H OPCO TRS LLC,
AND HCP SENIOR HOUSING PROPERTIES, LLC